TRIPLE A SERVICES, INC., *et al.*, Plaintiffs-Appellants, v. FRED RICE *et al.*, Defendants-Appellees.

First District (5th Division)   No. 86—1274

Opinion filed August 19, 1988.

MURRAY, J., dissenting.

Mark J. Ballard, of Cannizzaro & Ballard, and Ronald F. Neville, of Neville, Pappas & Mahoney, both of Chicago, for appellant Gilbert Vargas.

Judson H. Miner, Corporation Counsel, of Chicago (Ruth M. Moscovitch and Frederick S. Rhine, Assistant Corporation Counsel, of counsel), for appellees Fred Rice and City of Chicago.

Earl L. Neal & Associates, of Chicago, for appellee State of Illinois Medical Center.

JUSTICE PINCHAM delivered the opinion of the court:

Plaintiffs, Thunderbird Catering (Thunderbird) and Triple A Services, Inc. (Triple A), both mobile food vendor companies, were engaged in the business of selling prepared foods to pedestrians and motorists traveling within the "Medical Center District" of Chicago (the District) on the near west side of the city. Plaintiff Gilbert Vargas was a driver-salesman for Triple A, and plaintiff Nicolas Garcia was a driver-salesman for Thunderbird. Plaintiffs filed separate complaints for declaratory judgment, injunctive and other relief against the City of Chicago (the city) and Fred Rice, superintendent of the Chicago police department. The complaints were consolidated. In both complaints, plaintiffs sought to enjoin enforcement of section 27—269.1 of the Municipal Code of the City of Chicago (the ordinance) (Chicago Municipal Code §27—269.1) on the ground that the ordinance was unconstitutional because it was overly broad, capricious, irrational, arbitrary, unreasonable, discriminatory, failed to accomplish the purpose for which it was ostensibly enacted and violated the constitutional principles of equal protection and due process.

The ordinance, enacted by the city council on September 6, 1984, states in pertinent part:

"Whereas the purpose of said district is to provide conditions most favorable for the special care of the sick and injured and for the study of disease; and

Whereas the continued and enhanced operation of said District requires the restriction of certain vehicular traffic therein; now therefore

* * *

No person shall conduct the business of a Mobile Food Dispenser or Peddler, as defined in this code, on any portion of the public way within the boundaries of the Medical Center District, to wit: Ashland Avenue on the east, Congress Parkway on the north, Western Avenue on the west, and a line co-incidental. with the north line of the property at or near 14th Street and 15th Street owned or used by the Baltimore and Ohio Chicago Terminal Railroad Company for railroad purposes, on the south. Nor shall any person operate, stop or park any vehicle on any portion of the public way for the purpose of conducting any such business.

Any person who violates the provisions of this Section shall be fined no less than $50 nor more than $500 for each offense."

The defendants and the State of Illinois Medical Center Commission, the governing body of the District and an intervening defendant, filed a motion to dismiss the complaints, which motion was denied. The trial court then conducted an evidentiary hearing on plaintiffs' request for preliminary injunctive relief and thereafter upheld the constitutional validity of the ordinance, denied plaintiffs relief and entered judgment in favor of the defendants. Plaintiff Vargas seeks reversal of the trial court's rulings and judgment. We reverse. The testimony presented at the hearing follows.

Dr. Carl Kriesel, plaintiffs' witness and a professor of geography and environmental studies at Northeastern Illinois University in Chicago, testified that the major portion of his current course work consisted of urban geography and metropolitan transportation and that he had extensive experience in urban planning and zoning. Dr. Kriesel testified that after examining the District he found that there was a low quantity of traffic and no traffic congestion. Dr. Kriesel opined that no adverse effects on any of the medical activities in the various buildings or upon the essential character and atmosphere of the District would occur because of the operation of mobile food vending vehicles. Dr. Kriesel also testified that as a city planner and urbanologist, the ordinance's 24-hour, 7-day-a-week ban of mobile food dispensing vehicles from the District could not be justified. Dr. Kriesel further testified that it was unsound planning to prohibit mobile food vehicles from the District for 24 hours a day be-

cause the ban required motorists in the District to leave the District for food and thereby increased the possibility of traffic accidents and congestion. Dr. Kriesel further opined that the poorer segment of the population would be most adversely affected by the ban and that a responsible urban planner in an area such as the District would not prohibit mobile food vending solely for aesthetic reasons and without regard to the resultant undesirable impact upon these semi-indigent individuals.

Matthew C. Sielski, a witness for plaintiffs, testified that he had a bachelor of science degree in civil engineering, a master of science degree in transportation and traffic engineering and that he had approximately 50 years of experience in traffic engineering and safety analysis. Sielski testified that the District was bifurcated; the first area of the District, bounded by Congress, Roosevelt, Ogden, and Ashland Streets, consisted primarily of medical facilities and two high schools; and the second area, bounded by Congress, Roosevelt, Western and Ogden Streets, consisted primarily of residential and industrial areas. Sielski testified that the traffic control measures in the first area of the District were excellent and that traffic there was moderate and well regulated. In the second area of the District, Sielski testified, there was no heavy pedestrian or vehicular traffic and very little traffic congestion. Sielski testified further that in his opinion legally parked mobile food vendor vehicles transacting business in the District did not affect the flow of traffic in the District and were not hazardous to vehicular or pedestrian traffic in the District.

Shirley Landers, a paramedic and ambulance attendant, driver and dispatcher in the District for several years, testified for plaintiffs that she was in the District frequently, often on a 24-hour-a-day basis. Landers testified that the route of her ambulance was never obstructed or even interfered with by a mobile food vendor vehicle and that no ambulance driver ever reported any such interference at any time. Additionally, Landers testified that she often purchased food from mobile food vendors in the District and never saw any litter in the area around the mobile food vehicles.

Plaintiffs' witness Pierre Devise, an associate professor, writer, consultant and community activist specializing in urban geography and medical geography, testified that he had a Ph.D. in public policy analysis, that he was a consultant to hundreds of local and international agencies and had published scores of articles, many of which dealt with Chicago hospitals and the District. Devise testified that he was recognized as an expert in urban planning and medical geogra-

phy and had examined the District at least 200 times. Devise testified that the possibility of any increase in the number of hospital beds in the District within the foreseeable future was remote and that in recent years the Federal government had called for reductions of hospital beds in the District.

Devise testified that after he investigated the District and observed traffic and the mobile food vendors transacting business in the District he concluded that the presence of legally parked mobile food vending vehicles had no measurable impact upon the flow of traffic or upon health and sanitation considerations in the District. Devise further testified that the presence of mobile food trucks within the District was not likely to impact upon the willingness or desire of people to use the District, with the exception of some North Shore patients who "may be distressed at the sight of black poor people eating out of these mobile vendors." Devise stated that no consideration of public interest justified the exclusion of mobile food vendor vehicles from the District because the mobile food vendor vehicles had only a minor, insubstantial and insignificant impact upon the flow of vehicular traffic, pedestrian traffic and sanitation in the District. Devise also testified that the presence of mobile food vending services in the District would have an economic impact upon food service facilities provided by the hospitals, but that the exclusion of business competition from an area was not a proper function of city planning. Devise opined that the deterrent effect attributable to the presence of poor and minority people using the mobile food vending services was "very minor and insignificant."

Plaintiffs' witness Lester Rockoff, a certified public accountant, testified that for 10 years he was an accountant for plaintiff Thunderbird. Rockoff projected annual sales of $835,000 by Thunderbird for the year of 1985, with 23% of that amount derived from sales in the District.

George Toft, called by plaintiffs as an adverse witness, testified that he had been an administrative aide to the Chicago city council committee on traffic control and safety since 1974. Toft testified that a schedule of the regular meetings of that committee for 1984 was not prepared or posted. Toft testified that he prepared the agenda for the July 27, 1984, meeting of the committee on traffic control and safety. Toft related that the ordinance involved herein was not included on the agenda for the committee's July 27, 1984, meeting. The main objective of the meetings of the committee on traffic control and safety, Toft testified, was to study and analyze proposed ordinances. Toft testified, however, that no studies were considered

and no reports were received by the committee concerning the feasibility of this ordinance as of the date of the July 27, 1984, meeting and that no expert appeared before the committee to review or to present testimony concerning this ordinance. Rather, Toft testified, this ordinance was only considered by the committee on traffic control and safety for "maybe three to four minutes," because the members of the committee were "in a hurry to have cake and coffee" in celebration of the committee chairman's birthday. Toft further testified that no statements were presented to the committee at the July 27, 1984, meeting on the necessity of this ordinance, that the committee had never considered a similar ordinance, and that he did not know how the individual members of the committee informed themselves of the merits of this ordinance before voting for its approval.

John Alexander, plaintiffs' witness, testified that as an employee of Thunderbird for 23 years he had spent a total of 15 years in the District. Alexander testified that as a supervisor at Thunderbird his duties included the inspection of trucks and drivers for cleanliness. Alexander testified that "99 percent of the time" the mobile food vending trucks in the District were parked next to parking meters, and that the other 1% of the time Alexander had the drivers move the trucks to legal parking spaces. The trucks, Alexander testified, contained garbage disposal facilities and the drivers were trained to properly dispose of their own litter and the litter of any other fast-food outlets near plaintiffs' mobile food vehicles. Alexander testified that pedestrians did not have difficulty passing people making purchases from plaintiffs' trucks. Alexander also stated that plaintiffs' drivers were instructed not to serve individuals who were double parked and attempting to purchase food from plaintiffs' trucks.

Steven Roman, also called by plaintiffs as an adverse witness, testified that he was the coordinating planner for the City of Chicago and the Chicago department of planning. He related that neither he nor anyone else conducted a study or investigation on the effect of mobile food vendors in the District and that he knew of no investigation or study of the effect of mobile food vendors doing business in the District. Roman further testified that planning department objectives included the safe flow of traffic in the District and a "most professional looking environment." Roman injected simply that mobile food vending was "primarily out of character with the Medical Center Commission's appearance and presentation to those coming into it."

Ellen O'Donnell, an employee of Thunderbird for 17 years, testi-

fied as plaintiffs' witness that it took mobile food vendors approximately five or six years to develop a route. O'Donnell also testified that the mobile food vendors did not interfere with traffic or pedestrians and that Thunderbird had never been ticketed by the board of health for refuse around the trucks.

Plaintiff Gilbert Vargas testified that he was granted licenses in 1984 and 1985 by the city to serve as a mobile food vendor. Vargas testified that at no time in 1984 was he given notice by the city or by any other agency of the city that an ordinance would be considered by the city which would prohibit him and other mobile food vendors from operating in the District. Neither, Vargas testified, did he receive any notice prior to September 6, 1984, of any limitations or restrictions on his right to transact business in the District. Vargas testified that he was not advised by the city or any agency of the city that an ordinance was before the city council for consideration and adoption which would prohibit his operating in the District and he was not notified that he had a right to be present at any hearing relative to the ordinance in question. Vargas further testified that he was authorized to operate his mobile food dispensing vehicle anywhere else in the city but that he had operated at the same location in the District for the past eight years. Vargas also testified that he sold food only to persons standing on the sidewalks, that neither his mobile food vehicle nor his customers had ever restricted the movement of any emergency vehicle and that the only ticket he had received within the past five years was for an alleged violation of this ordinance in question before us.

John Guth, a salesman, administrator and supervisor of plaintiff Triple A vendors in the District, testified as plaintiffs' witness that he supervised routes, coordinated stops and trained new drivers. Guth testified that the mobile food vendors parked only at parking meters and sold only to customers on the sidewalks near the mobile food vehicles. Guth further testified that he never observed a mobile food vendor or customer obstruct the path of an emergency vehicle.

Prior to September 6, 1984, Guth testified, Triple A did not receive notice that a hearing would be conducted on any date regarding this proposed ordinance which would terminate the rights of or place any restrictions upon the operation of mobile food vendors in the District. Guth knew of no citations received by Triple A from the board of health for littering.

The defendants called only two witnesses. Martin Murphy testified for the defendants that he was an urban land planner and that he was very familiar with the District. Murphy testified that the ef-

fects of mobile food vending on the District could be measured in terms of vehicular and pedestrian traffic safety, housekeeping, nuisance, and maintenance of the general well-being of the area, and the protection of the investments of the property owners, who were "the major institutional base of hospitals and related facilities."

Murphy testified that on one occasion he observed a mobile food truck parked across the driveway of a loading dock in the District which caused traffic to be blocked. He did not relate, however, what, how or the extent to which the traffic was thereby blocked. Murphy indicated that protection of the investments of property owners in the area of the District was a consideration warranting the prohibition of mobile food vendors in the District. Murphy testified that the mobile food vehicles detracted from the ambiance of the District and that mobile food vending did not fit aesthetically anywhere within the District, although he did not relate the manner in which it did not aesthetically fit. Murphy admitted that he had no experience in the planning development of the District. Murphy admitted further that he knew of no studies which presented a correlation between traffic safety and the presence of mobile food vending trucks within the District, or between the presence of mobile food vending vehicles and pedestrian traffic hazards in the District. Murphy acknowledged that he was not aware of any studies of the impact of mobile food vending vehicles on housekeeping considerations as compared to those of other forms of food services within the District, that he knew of no document prepared by the department of planning of the City of Chicago which recommended that mobile food vendors be eliminated from the District, and that neither he nor the department of planning ever recommended to any agency of the city that mobile food vendors be banned from the District. Murphy admitted that he did not know (1) of any traffic accident which was caused by the presence of a mobile food vehicle in the District, (2) of any mobile food vehicle interfering with an emergency vehicle, (3) of any personal injury caused by a vendor, or (4) of any health problems attributable to the presence of a mobile food vendor in the District.

Charles Sklavanitis, director of the office of technology development of the University of Illinois at Chicago, the other witness for the defendants, testified that he had a background in public administration and planning and extensive involvement with the District. Sklavanitis testified that assuring the free flow of traffic, avoiding or minimizing vehicular and pedestrian conflicts, and the security and appearance of the District were considerations which he employed in arriving at his conclusion that mobile food vendors should be banned

from the District. Sklavanitis testified that he observed a tendency of mobile food vendors to concentrate their business activities in heavy traffic areas and that he objected to the presence of the vehicles on the bases of safety and appearance, two features which he associated with the regulation of street activity within the District. Sklavanitis admitted that he knew of no traffic study or traffic report which found that mobile food vending vehicles obstructed the path of motor vehicles or pedestrians in the District. Sklavanitis also admitted that of the thousands of vehicles in the District on a daily basis only six of those vehicles were mobile food vending vehicles. Sklavanitis knew of no accident or personal injury caused by a mobile food vehicle.

Hiram Sibley, a rebuttal witness for the plaintiffs, testified that he was an emeritus professor at the University of Illinois School of Public Health and had spent 50 years in the field of public health. Sibley worked at the American Hospital Association for seven years, was the director of the Hospital Planning Council of Metropolitan Chicago for nine years, a professor of health resources management at the school of public health at the University of Illinois for 10 years and also during the decade, 1971 to 1981, was the director of the Center for Study of Patient Care and Community Health. Sibley testified that he graduated from the Yale University School of Public Health and was the director of the Connecticut Hospital Association for nine years. Sibley also testified that he had "a great deal" of experience in planning the District, including acting as the director of the Hospital Planning Council of Metropolitan Chicago and reviewing and approving plans for the expansion and development of four major local hospitals. Sibley stated that he knew of only four cafeterias and two restaurants in the District and that they had "long lines" and were "slow going."

There was no evidence presented at the hearing which established that there was any relationship or connection, direct or casual, between the mobile food vendor vehicles in the District and the District's purpose "to provide conditions most favorable for the special care of the sick and injured and for the study of disease." Nor was there any evidence presented that the prohibition of mobile food vendor vehicles, and none other, from the District, enhanced the District's performance and fulfillment of its purpose of providing care for the sick and injured and for the study of disease. Moreover, no evidence was presented that the mobile food vendor vehicles in the District had any bearing whatever on the District's providing medical care or on the District's study of diseases.

At the conclusion of the hearing the trial judge stated, *inter alia*:

"I think this case arises in the area of socio-economic legislation and the regulation of business. The test for constitutionality is, as defendants contend, whether there is a rational relationship between the means and the end. This is a very liberal test, one which can be met, as defendants assert, if the court can conceive of any rational purpose, means or ends. If the purposes, means or ends are reasonable, then the legislation must be upheld.

The question is, is the ordinance reasonable? I think that this requires an examination of the purpose sought to be served and the means used to implement that purpose.

The purpose of this legislation is found on its face to continue and enhance the operation of the Medical Center District. This is a rational, reasonable, legitimate purpose. The motivation for the purpose is found, in turn, in the purpose for the statutory creation of the Medical Center District itself to provide conditions most favorable for the special care of the sick and injured and for the study of disease. ***

The means adopted for this purpose are the restriction of certain vehicular traffic, the mobile food vendors. This is a rational, reasonable, legitimate means. *And it is conceivable that the city council found to its satisfaction that the mobile food vendors do cause traffic and pedestrian congestion and do cause littering in the District.*

That is, it *may* be found that the mobile food vendors impede and detract from the operation of the District. *And that being the case, it [the city council] was justified, rational and reasonable in adopting as its means a total ban of mobile food vendors from its entire District.*

That is a rational relationship between the purpose and the means. Given the purpose *** the enhancement of the District's operation, there is such a relationship with the means, a total ban of mobile food vendors from the District.

Here it must be noted that plaintiffs' real argument is with the statute creating the District, not the instant ordinance. The city council did not arbitrarily create this District and apply a total ban of mobile food vendors. The city council, in an effort to enhance the District, banned mobile food vendors. *** [T]he city council has a rational purpose in seeking to enhance the District created by the state for a special purpose.

While plaintiffs argue there is no rational purpose for banning them from the entire District, their real argument is that the District boundaries are too wide. It is perfectly reasonable for the city council to have a desire to enhance the District whose boundaries were state created.

Plaintiffs argue that a total ban from the entire District is unreasonable, arbitrary and capricious. And in plaintiffs' argument is \*\*\* implicitly that the defendants have not adopted the least restrictive directive to accomplish what is or may be a legitimate purpose. Again, all that is needed is that a rational, reasonable purpose and means and ends be found." (Emphasis added.)

On appeal, plaintiff Vargas contends that the ordinance employs unreasonable, capricious, discriminatory and arbitrary means, a 24-hour-a-day and 7-day-a-week ban of mobile food vendor vehicles from the entire District, to effectuate the ordinance's stated purposes. The ordinance states that the purpose of the District is "to provide conditions most favorable for the special care of the sick and injured and for the study of disease." The ordinance thereafter recites that "whereas the continued and enhanced operation of said District requires the restriction of certain vehicular traffic therein," therefore, "no person shall conduct the business of Mobile Food Dispenser or Peddler \*\*\* within the boundaries of the Medical Center District." The ordinance further prohibits mobile food vendors to "operate, stop or park" in the District. The ordinance thus prohibits all mobile food vendor traffic in the District at all times.

Plaintiff argues that the trial court looked only for a concept to justify the ordinance and that upon determining the purpose of the District the trial court then improperly decided that the ordinance's restriction of mobile food vendor vehicular traffic was rationally connected to the District's purpose, and thus erroneously found the ordinance valid. Plaintiff further argues that the trial court failed to determine whether or not barring mobile food vendor vehicles from the entire District 24 hours a day and 7 days a week was a reasonable method to accomplish the District's stated purpose of providing care for the sick and injured and for the study of disease. Plaintiff contends that the ordinance adopts a totally unreasonable method to accomplish its stated purpose and that the ordinance is therefore constitutionally invalid. A more cursory review of the trial testimony completely negates the trial judge's quasi-factual finding that "*it is conceivable* that the city council found to its satisfaction that the mobile food vendors do cause traffic and pedestrian congestion and do

cause littering in the District." (Emphasis added.) Instead, plaintiffs' evidence clearly established that before enacting the ordinance the city council did not consider any preenactment examinations or studies of the impact of mobile food vendors or their vehicles on the District. The city council posted no public notice of pending hearings on the ordinance and enlisted no experts to support its plan to ban mobile food vending from the District. Rather, plaintiffs' evidence established that the committee on traffic safety and control only deliberated upon the feasibility of enacting the ordinance for "maybe three to four minutes" because the members were anxious to leave to celebrate the committee chairman's birthday. Additionally, plaintiffs' evidence overwhelmingly demonstrated that mobile food vending did not negatively impact upon pedestrian traffic, that mobile food vending positively impacted upon vehicular traffic in some instances by reducing the number of motorists driving out of the District for food, and that mobile food vendors had never been cited by the board of health for littering or ticketed by the police for illegal parking or obstructing the paths of ambulances or other vehicles entering or departing the District and that their vehicles had never caused a traffic accident or personal injury. Traffic in the District was shown to have decreased in recent years due to the mass transit system. It was also shown that the city planned to increase the number of off-street parking places in the District. Traffic control measures in the District were excellent and traffic was well regulated and moderate with very little pedestrian or vehicular congestion. Based upon over 200 examinations of the District, one highly qualified expert testified that the effect of mobile food vendors on the willingness or desire of the public to enter the District was *de minimis* and no public interest justified the exclusion of the mobile food vendors from the District. The evidence showed that the ban of mobile food vendors had the greatest impact upon poorer people and that aesthetic concerns did not outweigh this impact upon poor people. Moreover, there was no evidence that there were any problems caused by the mobile food vendors which could not be or which had not previously been remedied by existing traffic, parking and littering ordinances. It was established without dispute, both by plaintiffs' and defendants' evidence, that there was a substantial market for mobile food vendors in the District, that the law of supply and demand of the market place not only supported but indeed required their presence. Nevertheless, there was a paucity of witnesses who claimed that mobile food vending in the District was a nuisance to them or personally offended them. Plaintiff Vargas operated his mo-

bile food vendor business in the District 8.5 hours a day for five years and sold only to customers standing on the sidewalk. He made 400 to 600 sales a day, but received only one ticket, for violating the ordinance here in question, within the five-year period. The evidence showed that it required a mobile vendor five to six years to establish a new food vendor route. It was further shown that the four cafeterias and two restaurants in the District had "long lines" and were "slow going."

The record is devoid of any evidence of how this controversy surrounding mobile food vending vehicles in the District began or the impetus for the city council's prohibition of mobile food vending vehicles in the District. Plaintiffs argue that the ordinance's prohibition of only their five active mobile food vendor vehicles from the District is an obviously suspect classification.

The determinative issue before us is whether the ordinance in question is reasonably designed to achieve its stated purpose. As the ordinance stands, a mobile food vendor is at all times and under all circumstances prohibited from even driving his or her mobile food vendor vehicle into or through the District. In the worst scenario a mobile food vendor in need of and seeking medical treatment could be stopped, ticketed and then fined for merely driving a mobile food vendor vehicle into the District to receive medical care. This is unjustifiable. The record does not reveal what the city council found so detrimental in mobile food vendors' merely driving through or within the District that justified their total ban from the District. There was no evidence that mobile food vehicles were wider, longer, noisier or more unsightly than any other vehicles which were allowed to enter into or pass through the District.

Defendants contend that mobile food vehicles should be banned because of the shortage of legal parking places which are available for persons using the medical facilities in the District, the implication being that other persons driving into the District have a greater right or a more urgent need to park than pedestrians and drivers who use the mobile food vending services to purchase food. This argument by defendants is obviously without merit.

■ In *Sherman-Reynolds v. Mahin* (1970), 47 Ill. 2d 323, 327, the supreme court set out the following general rule applicable to judicial review of a legislative enactment:

> "To be a valid exercise of the police power, the enactment of the legislature must bear a reasonable relation to the public interest sought to be protected, and the means adopted must be a reasonable method to accomplish such objective."

A mere rational purpose for the legislature to assert its police power in enacting legislation does not necessarily validate the legislation. Courts are empowered to review the legislation to determine whether it is constitutionally permissible. In *Rock v. Thompson* (1981), 85 Ill. 2d 410, 418, the supreme court held:

"It is the duty of the judiciary to construe the Constitution and determine whether its provisions have been disregarded by the actions of any of the branches of government. [Citations.] While this court cannot exercise legislative powers [citation], the judiciary has always had the right and duty to review legislative acts in light of the Constitution. As the court said in *Donovan v. Holtzman* (1956), 8 Ill. 2d 87, 93: 'The mere fact that political rights and questions are involved does not create immunity from judicial review. [Citations.]' "

It is clear that the mere existence of a rational purpose is insufficient, alone, to uphold a legislative enactment. The purpose of the legislation must be achieved by reasonable means. Defendants correctly argue, however, that as this court does not sit to weigh the wisdom of legislation (*Ferguson v. Skrupa* (1963), 372 U.S. 726, 10 L. Ed. 2d 93, 83 S. Ct. 1028), it is sufficient that an evil exists for correction and that the ordinance was a rational way to correct that evil. (*Harris v. Manor Healthcare Corp.* (1986), 111 Ill. 2d 350.) Although the police power may be superior to the rights of the individual, the police power is still restrained by the fundamental principles of justice and due process of law. The police power therefore cannot abrogate fundamental principles of justice, equal protection or due process. The due process limitation upon the exercise of the police power by a legislative unit of government prohibits the arbitrary, unreasonable, and capricious exercise of that police power. (*City of Decatur v. Chasteen* (1960), 19 Ill. 2d 204.) While it is for the legislature to determine when it should enact legislation in the public interest, it is for the courts to determine if the legislation is constitutionally valid. One test of a proper exercise of the police power is whether the legislation is reasonably designed to remedy the evil which the legislature has determined to be a threat to the public health, safety and general welfare. Assuming the existence of an evil, the evil's existence does not permit the adoption of arbitrary or unrelated means to remedy it. Moreover, it is the duty of the judiciary to construe the constitution and determine whether its provisions have been disregarded by the actions of any of the branches of government. While this court cannot exercise legislative powers, the judiciary is empowered with the duty to review legislative acts in light

of the constitution. *Rock v. Thompson* (1981), 85 Ill. 2d 410.

In *Heimgaertner v. Benjamin Electric Manufacturing Co.* (1955), 6 Ill. 2d 152, the court reviewed legislation which required employers to allow their employees two hours off from work on election day to vote and to pay them their normal wages for this two-hour period. In finding the legislation unconstitutional the court said:

> "The State may, in the exercise of its police power, restrict, regulate or prohibit any and all uses of private property in the interest of public health, safety and welfare. [Citations.] The police power, however, while paramount to the rights of the individual, is still restrained by the fundamental principles of justice connoted by the phrase, due process of law. \*\*\* [T]he police power cannot override the natural demands of justice, nor disregard the constitutional guarantees in respect to the taking of private property, due process and equal protection of the laws. This implies action not merely arbitrary, but having a relation to the health, safety, morals or general welfare of the public. Although it is for the legislature to determine when to act in the public interest, it is for the courts to ascertain if the exercise is a proper one. We have consistently stated that the standard of a proper exercise of the police power is whether the statute is reasonably designed to remedy the evils which the legislature has determined to be a threat to the public health, safety and general welfare." 6 Ill. 2d at 158-59.

In *Springfield Park District v. Buckley* (1986), 140 Ill. App. 3d 524, 488 N.E.2d 1971, the court reviewed an ordinance strikingly similar to the ordinance in the case at bar. In *Springfield* the ordinance prohibited motorcycles within any park or upon any drive or driveway in any park within the Park District. Comparably, the ordinance in the instant case prohibits mobile food vendor vehicles on the streets within the District. The stated purpose of the ordinance in *Springfield* was to eliminate from the parks motorcyclists who endangered small children and damaged public property by leaving the park roads and driving onto picnic areas or over golf courses. The means adopted by the Springfield ordinance to protect the small children and preserve the public golf courses and picnic areas was the total elimination of motorcycles from the parks. The court in *Springfield* held:

> "We find that the ordinance sweeps too broadly and is an unreasonable and arbitrary classification which unduly discriminates against motorcycles on park driveways.

\* \* \*

\*\*\* [I]t appears that the problems relating to the off-road use of motorcycles and speeding can be remedied by enforcement of the ordinance sections prohibiting such activity by any vehicle. \*\*\* There was no evidence that motorcyclists had ever injured children or other pedestrians within the parks. Further, virtually all of the evidence concerning recent off-road operation of motorcycles involved parks which have no driveways or road systems. It therefore appears that the prohibition sweeps too broadly and arbitrarily discriminates against motorcyclists who would otherwise operate their vehicles in compliance with regulations prohibiting speeding and off-road operation.

For these reasons, we find that ordinance 209-83 of the Springfield park district is invalid \*\*\* as being an unreasonable and unnecessary exercise of the power conferred therein." 140 Ill. App. 3d at 530-31, 488 N.E.2d 1971.

■ The ordinance under review in the instant case purports to further the District's purpose of providing "care of the sick and injured and for the study of disease" by totally eliminating mobile food vendor vehicles from the entire District. However, the trial evidence overwhelmingly established that the presence of mobile food vendor vehicles in the District had no impact, actual or prospective, upon the care of the sick and injured or on the study of diseases. The trial evidence unequivocally proved that the mobile food vehicles contained no noisemaking devices which were deleterious to the treatment or recovery of hospitalized patients or which impeded the work of medical personnel or medical students within the District.

In *Salomone v. City of Canton* (1961), 30 Ill. App. 2d 474, 175 N.E.2d 662, the court reviewed an ordinance which prohibited all parking along a two-mile section of Route 78. Witnesses testified on behalf of the plaintiffs that the ordinance prohibiting all parking would cause economic harm to plaintiffs' business. The city produced testimony that because of the volume of traffic on the road four 12-foot lanes were desirable. Prior to enacting the ordinance no recent traffic survey had been made by the city council. The court began by setting forth the applicable rule of law to the judicial review of an ordinance:

"There is no question but that plaintiffs' witnesses established that they would suffer a particular kind of burden if the ordinance in question were enforced. \*\*\* [T]he Courts may inquire into the reasonableness of the ordinance passed by a mu-

nicipality in the course of its exercising *** power. Such judicial inquiry, however, must be carefully and cautiously exercised. The ordinance must constitute an unreasonable exercise of the power vested before the Court can declare it to be invalid on that ground. In other words, the question of the existence of a connection between a given ordinance and the power claimed to be exercised thereby is primarily one for legislative determination and the Courts will not interfere unless the ordinance clearly appears to be unreasonable." 30 Ill. App. 2d at 478.

The court concluded that the prohibition of all parking of any type or character along the two-mile section of Route 78 was an unreasonable method to achieve the ordinance's purpose and found the ordinance to be constitutionally invalid.

Plaintiff correctly contends that the ordinance is overly broad in other respects. First, the ordinance identifies the western boundary of the District as Western Avenue. (Chicago Municipal Code §27—269.1.) The correct western boundary of the District is Oakley Street, one block east of Western Avenue. (Ill. Rev. Stat. 1985, ch. 111½, par. 5001.) Second, a portion of the southern part of the District is used for nonmedical purposes and therefore the ordinance, for its stated purpose, obviously should not have included these areas of the District.

There was no indication that the 24-hour-a-day and 7-day-a-week entire ban of mobile food vendor vehicles from the entire District was required. No study was conducted to determine the proper regulations or whether a more limited area or period of time might accomplish the purposes of the ordinance. There was no showing that it was necessary that the ordinance apply to all streets in the District or at all times. The record shows that the ordinance, as enacted, is not reasonably designed to promote health and safety in the District. Because the ordinance does not meet the test of reasonableness in its time and area limitations on mobile food vendors and also because the methodology set forth in the ordinance to achieve the ordinance's stated purposes is patently unreasonable, the ordinance cannot successfully withstand the attack upon its constitutional validity. We conclude upon the basis of the foregoing that the ordinance is unreasonably sweeping in its limitations of time and area. The ordinance is grossly overly broad and arbitrary, and creates a classification which invalidly discriminates against mobile food vendor vehicles in the District. (*Rocking H. Stables, Inc. v. Village of Norridge* (1969), 106 Ill. App. 2d 179, 245 N.E.2d 601.) The ordinance for

these foregoing reasons is constitutionally invalid. *Springfield Park District v. Buckley* (1986), 140 Ill. App. 3d 524, 488 N.E.2d 1971.

■ Plaintiff also contends that the passing of the ordinance by the city council committee on traffic control and safety without notice of hearings on the proposed ordinance to the mobile food vendors effectively divested the mobile food vendors of their vendor licenses without due process of law. We agree. Plaintiff's mobile food vendor license stated that the license could only be suspended or revoked for cause as provided by law. The Municipal Code of Chicago, section 101–27, which mandates that the suspension or revocation of a license issued under the authority of the Code must be for cause and requires both notice and a due process hearing, states in pertinent part:

> "The mayor shall have the power to suspend or revoke any license issued under the provisions of this code for any good cause or if he determines that the licensee shall have violated any of the provisions of this code or any of the statutes of the state. However, no such license shall be so revoked or suspended except after a public hearing first having given 5 days written notice of said hearing to the licensee affording the licensee an opportunity to appear and defend. The public hearing shall be held before a license commissioner appointed by the mayor who shall report his findings to the mayor." Chicago Municipal Code §101–27.

A license to operate a business cannot be revoked, nor can a renewal be denied without notice and a due process hearing. (*In re Ming* (7th Cir. 1972), 469 F.2d 1352; *Reed v. Village of Shorewood* (7th Cir. 1983), 704 F.2d 943; *Gallagher & Ascher Co. v. Simon* (7th Cir. 1982), 687 F.2d 1067.) Plaintiff operated his mobile food vending business in the District for five years and had done nothing wrong. Plaintiff was issued a mobile food vendor's license without any restrictions in 1984 and 1985. The city's passage of the questioned ordinance in 1984 effectively revoked plaintiff's license by prohibiting his access to his established route in the District. The trial evidence established that it would require plaintiff five or six years to replace his District route, from which the ordinance ousted him, with a comparable route. The ordinance effectively stripped plaintiff of his right to pursue his livelihood in the District without constitutional due process.

■ Additionally, plaintiffs argue that the ordinance and no notice of hearings on its proposed enactment constitute a violation of their civil rights under 42 U.S.C. §1983 (1982). We agree. In *Adams*

*v. City of Park Ridge* (7th Cir. 1961), 293 F.2d 585, the ordinance which prohibited all charities, except one, from soliciting and collecting funds except by the direction of the city council was found violative of 42 U.S.C. §1983; *Flood v. Margis* (7th Cir. 1972), 461 F.2d 253, holds that town officials who refused to renew plaintiff's license to operate a mobile park violated due process of law. In *Katris v. City of Waukegan* (N.D. Ill. 1980), 498 F. Supp. 48, the court held that the licensee had a property interest in his liquor license. In 1 C. Antieau, Federal Civil Rights Acts, *Civil Practice*, there is stated:

"Parties alleging that licenses or permits were denied them in violation of substantive due process or equal protection have been able to proceed in section 1983 actions. Similarly, it is held that a person states a section 1983 cause of action when he alleges that public officials are arbitrarily refusing to renew his license or revoking it in violation of due process of law. Physicians have been able to bring section 1983 actions against public hospitals for arbitrary or discriminatory revocation of staff privileges. An optometrist in a section 1983 action was able to prevent his license being illegally revoked. A lawyer could use a section 1983 action against a state bar association for having brought disbarment proceedings against him to harass him for representing unpopular clients.

When, under local law, licensees and permittees are deemed to have a property right in their licenses or permits, section 1983 actions are available to them to ensure that they receive procedural due process when public officials are revoking or suspending the authorization. Illustratively, a person having a liquor license was held to have a property right protectable by a section 1983 action to assure that he received procedural due process before the license was revoked. It has been held that a doctor was entitled to procedural due process before termination of his staff privileges in a private hospital operating under 'color of law,' and that this right was protectable in a section 1983 action." 1 C. Antieau, Federal Civil Rights Acts, *Civil Practice*, at 310-11 (2d ed. 1980).

The trial evidence in the pending case established that the city council passed the ordinance without any meaningful deliberation and without being informed that the means employed by the ordinance would accomplish the ordinance's stated purpose, or what effect the ordinance would have on the licensed mobile food vendors. It is apparent that the effect of the ordinance was not to further the purpose of the District but instead was to summarily revoke plaintiffs'

mobile food vendor licenses, without notice and a hearing as required under the due process clause of the fourteenth amendment of the United States Constitution (U.S. Const., amend. XIV), 42 U.S.C. §1983 (1982), and the Municipal Code of Chicago.

We reiterate that no evidence was presented at the hearing to establish that mobile food vendor vehicles in the District had any impact upon the District's performance of its purposes to provide care for the sick and injured and for the study of diseases. The substance of the testimony of the defense witnesses at the hearing simply was that the mobile food vendor vehicles' presence in the District was cosmetically offensive to them personally.

Plaintiffs in the case at bar, as the defendants in *City of Decatur v. Chasteen* (1960), 19 Ill. 2d 204, 210, "do not dispute the power or authority of the city to pass ordinances regulating 'the use of the streets' or to 'license, tax and regulate hackmen *** cabmen *** and all others pursuing like occupations ***,' " and in the instant case plaintiffs likewise concede, as the defendants conceded in *City of Decatur*, "that the State, in its legitimate exercise of the police power, has delegated the exercise of these functions, among others, to the various municipalities, *subject to constitutional limitations.*" Thus, in the case at bar, as in *City of Decatur*, the question of power to legislate upon this subject is not involved in this appeal. Plaintiff herein, like the defendants in the *City of Decatur*, "do not deny the authority of the city to make reasonable regulations concerning their business. *They object only to the classification and the method adopted.*" (Emphasis added.) 19 Ill. 2d at 210.

In *City of Decatur*, the defendants challenged the constitutionality of a city ordinance which prohibited operation of the defendants' livery vehicles on the city streets without a city license and a city inspected and accurate taximeter. The supreme court pointed out:

"We have repeatedly held that no one has any inherent right to use the streets or highways for business purposes. [Citations.] 'Where one seeks a special or extraordinary use of the streets or public highways for his private gain, as by the operation of an omnibus, truck, motorbus or the like, the State may regulate such use of the vehicles thereon or may even prohibit such use.' [Citation.]

The power to regulate and prohibit in such cases is beyond question ***." 19 Ill. 2d 211.

The very basis and considerations upon which the supreme court found the ordinance in the *City of Decatur* to be constitutionally valid are conspicuously lacking in the case at bar. The supreme court

held that the city, in the exercise of the police power, was justified in prescribing taximeters to secure uniformity of transportation charges, and further held:

"[T]he ordinance permits the operation of vehicles carrying passengers for hire without fixed route or schedule subject only to the conditions and restrictions imposed. *These are reasonably calculated to secure the public welfare and have a direct relation to the object sought to be attained.* ***

*** *Considering the nature of the business involved and the objects sought to be attained by the ordinance, the regulations are reasonable and proper and free of the constitutional objection here urged.*

***

The equality clause of the fourteenth amendment to the Federal constitution does not deprive a State of its power to pass laws for the protection of the public health, safety and morals and the promotion of the general welfare. *The question of classification is primarily legislative and only becomes judicial when the legislative act is clearly unreasonable.* [Citation.] *The State and its municipal corporations under their delegated powers may regulate the use of the streets and highways where no merely arbitrary discriminations are made.*" (Emphasis added.) 19 Ill. 2d at 211-13.

Plaintiffs in the case at bar correctly contend that the instant ordinance is clearly unreasonable, arbitrary, discriminatory and has absolutely no direct relation to the object sought to be attained. Plaintiffs further correctly contend that in the trial court they more than adequately complied with the supreme court's mandate in *City of Decatur*:

"One who challenges the validity of an ordinance as arbitrary and unreasonable must prove by clear and affirmative evidence that the ordinance constitutes arbitrary, capricious, and unreasonable municipal action; that there is no permissible interpretation which justifies its adoption, or that it will not promote the safety and general welfare of the public." 19 Ill. 2d at 210.

*City of Decatur* was followed in *Olsen v. City of Chicago* (1962), 25 Ill. 2d 292, in which the supreme court upheld a city ordinance that prohibited suburban taxicabs which were not licensed by the City of Chicago from soliciting or accepting fares within the city, particularly at O'Hare Airport. In *Olsen* the plaintiffs agreed that "the city has complete power to regulate the use of the streets by

taxicabs" and the court stated that "the power of a municipality to regulate or prohibit the use of its streets for private gain is established." (25 Ill. 2d at 294.) The supreme court rejected the plaintiffs' contention in *Olsen* that plaintiffs should have "the right to pick up passengers in one municipality in which they have no license to operate, and to carry those passengers to other municipalities in which they have no license to operate." 25 Ill. 2d at 295.

The power of the City of Chicago to regulate and prohibit the use of its streets for private gain is unquestioned in the case at bar. Likewise, in the case at bar, plaintiffs do not contend that they have, and indeed they do not have, an inherent right to use the streets or highways for business purposes and nothing in this opinion is to be construed to the contrary. The evidence presented at the hearing in the court below proved, however, clearly and affirmatively, that the ordinance constitutes arbitrary, capricious, and unreasonable municipal action, that there is no permissible interpretation which justifies its adoption and the ordinance has no direct relation to the objects sought by the ordinance to be attained.

We summarize a portion of the undisputed evidence presented at the hearing on which plaintiffs relied in support of their contention and from which we conclude that the ordinance is unreasonable, arbitrary, capricious, violative of due process and equal protection and has no direct relation to the objects sought to be attained and that the ordinance is unconstitutional. The District is divided into two parts, in one of which there is located the medical facilities and high schools; the other contains residential and industrial areas and there is virtually no institutional use of the medical center land south of Roosevelt Road from Western Avenue to Ashland Avenue. There are no plans for medical uses south of Roosevelt Road. The probability of hospital expansion in the area is remote for the foreseeable future. Traffic control measures in the District are excellent and traffic in the District is moderate and well regulated. There is no heavy pedestrian movement or congestion in the District. Private vehicular traffic in the District has decreased in recent years; existing mass transit systems have reduced the number of cars which enter the District and plans exist to increase the District's street parking spaces. The mobile food vendors had no effect upon the traffic flow, were not hazardous to traffic and never interfered with ambulance or other vehicular traffic in the District. They did not create a litter problem, had no negative impact upon the health or sanitation in the District and had only a *de minimis* effect upon the public's willingness or desire to enter the District. The mobile food vendors' super-

visor, who had 15 years' experience working in the District, inspected the trucks and drivers for cleanliness and supervised the drivers to assure that they keep themselves, their trucks and the areas clean and that the drivers park legally and avoid any traffic problems. The mobile food vendors had no adverse effects on any of the medical activities or studies of disease in the District, and no rational reason existed for and no public interest is served by banning them from District. The four cafeterias and two restaurants in the District had long lines which were slow moving and the prohibition of mobile food vendors in the District had the greatest impact upon poorer people and necessitated their leaving their areas in the District for food, which thereby increased traffic and vehicular accidents. Plaintiff Vargas operated his mobile food vendor trucks in the District 8.5 hours per day for five years and made 400 to 600 sales per day, only to those persons who were on the sidewalk. During Vargas' five-year sales period, he received only one traffic ticket, which was for allegedly violating the ordinance in question before us. To establish new routes for medical food vendors is extremely difficult and requires five to six years. Twenty-three percent of plaintiff Thunderbird's total income was derived from vendor sales in the District. Neither the City of Chicago planning department, nor any other Chicago employee, conducted a study or investigation of the effect of mobile food vendors on the District and, even though the city council's committee on traffic control and safety had a duty to study and analyze proposed ordinances, nevertheless, no study or report was considered by the committee, which had never previously considered a similar ordinance and which committee considered the ordinance in question for only three or four minutes because its members were in a rush to attend the committee chairman's birthday party, and lastly, no notice was given that the ordinance was before the city council or the committee on traffic control and safety for its consideration and passage.

Having found the ordinance invalid on the grounds urged before us by plaintiffs, we need not address plaintiffs' remaining contention that the ordinance is invalid because it was passed in violation of the Open Meetings Act (Ill. Rev. Stat. 1983, ch. 102, par. 41 *et seq.*).

The home rule contention raised and relied on by the dissent was never raised or relied on by any party in the trial court, nor did the trial court in any way rely on this contention in rendering its decision upholding the ordinance. Moreover, this home rule contention, relied on by the dissent, has not been briefed, argued or raised by any party in this court. It is raised *sua sponte* by the dissent. Addi-

tionally, the "Whereas" language of the ordinance, as it is previously set forth herein, is as it appears verbatim in the record before us and it is also the language of the ordinance that was before the trial court and on which the trial court ruled. The accuracy of the language of the ordinance as set forth herein has not been challenged by any party either in the trial court or in this court. The dissent's reliance on the language of the ordinance as it appears in the council journal, rather than as it appears in the record, goes beyond the record. More importantly, however, the dissent's reliance on the absence of the "Whereas" language from the ordinance as it appears in the council journal is also raised by the dissent *sua sponte* and has not been argued, briefed or raised by any party.

The judgment of the circuit court is reversed and the cause is remanded for further proceedings consistent with the views expressed herein.

Reversed and remanded.

LORENZ, P.J., concurs.

JUSTICE MURRAY, dissenting:

I respectfully disagree with the majority's conclusion that the involved City of Chicago ordinance is invalid as applied to the plaintiffs and its reversal of the trial judge's final order.

The court's decision as it now stands is contrary to decisions of the Illinois Supreme Court which have held that a municipal corporation has the power to regulate or prohibit the use of its streets for private gain. *Olsen v. City of Chicago* (1962), 25 Ill. 2d 292, 184 N.E.2d 879; *City of Decatur v. Chasteen* (1960), 19 Ill. 2d 204, 166 N.E.2d 29.

The cases cited and relied on by the majority, *Springfield Park District v. Buckley* (1986), 140 Ill. App. 3d 524, 488 N.E.2d 1071, and *Salomone v. City of Canton* (1961), 30 Ill. App. 2d 474, 175 N.E.2d 663, involved the improper exercise of powers delegated to a non–home-rule unit by the legislature regarding use of streets within its boundaries. The City of Chicago is a home rule unit of local government. The involved ordinance was the exercise by a home rule unit of a power it was granted by the 1970 Constitution, not by the State legislature. (Ill. Const. 1970, art. VII, §6.) The only statute involved in this case is the statute creating the medical center district and conferring on the Medical Center Commission certain powers. (Ill. Rev. Stat. 1985, ch. 111½, par. 5001 *et seq.*) That statute ex-

pressly provides that it "not be construed to limit the jurisdiction of the City of Chicago to territory outside the limits of the District nor to impair any power now possessed by or hereafter granted to the City of Chicago or to cities generally except such as are granted to the Commission by Section 8 of this Act." (Ill. Rev. Stat. 1985, ch. 111½, par. 5019.) Section 8 of the act creating the medical center district confers power to the Medical Center Commission to improve and manage the district, but does not limit the power of the City of Chicago over the streets of the district lying within the City. Ill. Rev. Stat. 1985, ch. 111½, par. 5018.

The Constitution of 1970 expressly provides that "Powers and functions of home rule units shall be construed liberally." (Ill. Const. 1970, art. VII, §6(m).) By suggesting that the ordinance is invalid because evidence presented to the trial court indicated no relationship between the "Whereas" clauses of the ordinance and its substantive provision is to adopt a narrow, rather than liberal, construction of the home rule powers of the City of Chicago contrary to the mandate of the Illinois Constitution.

The preamble to an act, as well as the text, may be examined by a court to determine legislative intent. (*Radford v. Cosmopolitan National Bank* (1964), 52 Ill. App. 2d 240, 201 N.E.2d 622.) However, a declaration of policy or a preamble is not part of the act. (*Hayen v. County of Ogle* (1983), 116 Ill. App. 3d 80, 451 N.E.2d 612, aff'd (1984), 101 Ill. 2d 413, 46 N.E.2d 124.) It is an improper mode of statutory construction to create an ambiguity in a statute or ordinance by reference to a policy section of an act. (*Brown v. Kirk* (1976), 64 Ill. 2d 144, 355 N.E.2d 12.) The majority, by suggesting that the evidence fails to support the "Whereas" portions of the ordinance, creates an ambiguity between the ordinance itself and its statement of policy.

Further, the plaintiffs may have a right to use the streets of Chicago by reason of their license, but they have no due process or legally protected right from the City's subsequent regulation of the streets of the medical center district prohibiting their use by mobile food dispensers. (*Foster & Kleiser v. City of Chicago* (1986), 146 Ill. App. 3d 928, 497 N.E.2d 459.) There was no evidence that the ordinance was applied discriminatorily or that the City otherwise abused its constitutional or statutory jurisdiction in enacting the ordinance. Absent such evidence, the trial court properly denied the plaintiffs' request to enjoin the application of the ordinance as it applied to them.

The plaintiffs are not without a remedy. There is nothing in the

ordinance to prevent them from seeking permission from the Medical Center Commission to park and vend their food on its property or the property of one of the medical institutions located within the medical district. If the Commission denied such permission, the act and the law provide a judicial remedy if the Commission acts illegally. Ill. Rev. Stat. 1985, ch. 111½, par. 5015.

Finally, the majority opinion misstates the facts relating to the ordinance. The journal of the council's proceedings of September 6, 1984, discloses that a proposed ordinance was introduced on December 15, 1982, and referred to the city council's committee on traffic control and safety. On September 6, 1984, the committee submitted a report that the following ordinance be passed "as a substitute" for the proposed ordinance previously referred to. The substitute ordinance reads in part:

> "Section I, Chapter 27 of the Municipal Code of the City of Chicago is hereby amended by adding thereto in italics a new section 27—269.1 as follows:
>
> 'No person shall conduct the business of a mobile food dispenser or peddler as defined in this Code on any public way within the boundaries of the Medical Center District to-wit: ***.' " (See Journal of Proceedings, Chicago City Council, September 6, 1984, at 8747-48.)

The ordinance passed by unanimous vote. Alderman Natarus moved to reconsider the vote and his motion lost.

The "Whereas" clauses referred to by the majority were not in the ordinance when presented to the council according to the council journal. "[T]he parliamentary history of a bill in the legislative journal is the only evidence that is recognized in the courts of this State, and it cannot be aided or contradicted by evidence *aliunde.*" (*People ex rel. Coutrakon v. Lohr* (1956), 9 Ill. 2d 539, 551, 138 N.E.2d 471.) The majority, by referring to "Whereas" clauses not contained in the ordinance presented to and passed by the council according to its journal of proceedings, is unknowingly violating this established rule.

For the above reasons, I would affirm the trial judge.